IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANNA DARCHAK, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 104 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anna Darchak has filed a four-count second amended complaint against defendant Board of Education of the City of Chicago ("Board"), alleging: disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (Count I); national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., (Count II); retaliatory discharge (Count III); and retaliation for exercise of her First Amendment rights in violation of 42 U.S.C. § 1983 (Count IV). Defendant has filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons discussed below, the court grants defendant's motion.

### FACTS[1]

Plaintiff's History with CPS

Plaintiff, who was born in Poland and speaks both Polish and English, moved to the United States in 1991. She began working for the Chicago Public Schools ("CPS") in 1994,[2]

---

[1]These facts are taken from the parties' L.R. 56.1 Statements and accompanying exhibits.

[2]Plaintiff holds the following endorsements and certifications: State of Illinois Teaching
(continued...)

teaching in the Bilingual and English as a Second Language ("ESL") programs at Taft High School. In 2002, plaintiff resigned and began working in the Newcomers/Refugee program and the Bilingual Parent Resource Center for the CPS Office of Language and Culture ("OLCE"). At that point, plaintiff lost her tenure status with CPS and became an educational support employee.

In the fall of 2004, while still an OLCE employee, plaintiff began providing ESL support to both Polish and Spanish English Language Learners ("ELLs") at several schools, including Princeton Alternative Center ("Princeton"), an elementary school. At that time, Princeton had an enrollment of 300 students. 77% of those students were Hispanic, 6% were Polish, and 18% were African-American. As of February 2005, plaintiff worked at Princeton five days a week as an ESL and a Polish bilingual teacher.

In April 2005, plaintiff submitted an application to Rosalva Acevedo, principal of Princeton, for a teaching position for the 2005-06 school year. Acevedo, who knew that plaintiff was of Polish national origin, hired her as a teacher effective September 7, 2005. According to Acevedo, she felt that plaintiff's Polish language skills would be a useful addition to Princeton's teaching staff. At that time, plaintiff's status was "Reinstatement of Non-Renewed Probationary Appointed Teacher ('PAT')."[3] Plaintiff, whose salary was funded through a supplementary

---

[2](...continued)
Certificate for Standard Secondary Teaching, Grades 6-12; Endorsements in Civic/Political Science, Economics, Sociology, and Social Science; and Approvals in Special Education ESL, Teacher of ESL, Bilingual Special Education: Polish, Bilingual Education: Polish. Plaintiff also has bachelor and graduate degrees from Polish universities and a Masters degree in Special Education.

[3]A PAT is a teacher who has not yet attained tenure status. A PAT generally receives
(continued...)

2

OLCE grant, understood that she had been hired because of an anticipated increase in Polish ELL students at Princeton. Plaintiff, though, was certified to teach ESL, which allowed her to teach all ELL students regardless of their native language.

Plaintiff began teaching ESL and providing tutorial support at Princeton in September 2005. On November 1, 2005, Acevedo gave plaintiff a Cautionary Notice for "insubordination," which stated that plaintiff had not been following Princeton's required ESL teaching schedule. That notice stated that it "[did] not constitute any form of disciplinary action," but plaintiff refused to sign the form. According to plaintiff, Acevedo said during their meeting, "I brought you here to this school and you stupid Polack pushed the teachers against me." Later that day, plaintiff sent an email to Yvonne Womack, Acevedo's supervisor, asking to speak with her privately about the "dishonest atmosphere at Princeton." Plaintiff and Womack met shortly thereafter, and on November 8, 2005, plaintiff sent Womack a letter stating that Acevedo was violating the students' rights and treating her in a hostile manner. Plaintiff sent Womack a similar letter on November 22, 2005.

According to plaintiff, at some point during November 2005, Acevedo called plaintiff a "stupid Polack" and told her that Hispanic students were better than Polish students. Plaintiff did not tell anyone other than her husband about Acevedo's alleged comments, and she did not report them to Womack, Medina, the CPS Labor Relations Hearing Office, or anyone else at defendant. On November 8, 2005, plaintiff sent a letter to Manuel Medina, head of OLCE,

---

[3](...continued)
tenure after four consecutive years without a break in service.

listing her complaints regarding Acevedo. That letter did not contain any mention of Acevedo's alleged statements regarding Polish students or plaintiff's national origin.

In March 2006, Princeton's assistant principal resigned, leaving empty the teaching position in Room 206. Room 206, a combined class of sixth, seventh, and eighth graders, contained a high percentage of ELL students. After confirming that plaintiff possessed the requisite credentials, Acevedo asked plaintiff to teach Room 206 on a temporary basis. Acevedo assigned Roberto Arrona, a bilingual teacher's aide, to provide Spanish language support to plaintiff in Room 206. Arrona had previously provided similar support to Molly Chatman, who had taught Room 206 on a substitute basis and did not speak Spanish or possess an ESL endorsement. Plaintiff told Acevedo that requiring her to teach Room 206 was a violation of the No Child Left Behind Act because plaintiff was not qualified to teach a Spanish bilingual classroom. On March 3, 2006, plaintiff sent an email to both Medina and Womack repeating the same concerns. According to defendant, Room 206 was not a Spanish bilingual classroom. OLCE bilingual compliance auditor Xochit Rosales found that: Room 206 was not a Spanish bilingual classroom; plaintiff was qualified to teach Room 206; and plaintiff could not have reasonably believed that Room 206 was a Spanish bilingual classroom. On April 18, 2006, plaintiff also filed a union grievance concerning her assignment to Room 206.[4]

Plaintiff taught Room 206 from March 3, 2006, to April 7, 2006. During that period, plaintiff completed 54 student disciplinary forms, stating that the students were "bullies" and gang members. Plaintiff sent several emails to Womack and Medina complaining about her assignment to Room 206. On March 10, 2006, Acevedo gave plaintiff a second Cautionary

---

[4]Neither party addresses the outcome of plaintiff's union grievance.

Notice, which stated that plaintiff had been discourteous and negligent in the supervision of her students. Specifically, it stated that plaintiff had referred to the class as "immigrants" and threatened to tell Acevedo that a student had pushed her. Once again, plaintiff refused to sign the Cautionary Notice.

On March 27, 2006, Acevedo issued plaintiff a negative performance evaluation, which plaintiff refused to sign. The evaluation stated that plaintiff had problems with following rules, dealing with students and parents, and cooperating with members of the school community.

Plaintiff's Medical History

Plaintiff alleges that she became ill after receiving the Cautionary Notice on November 1, 2005, and went to her physician, Dr. Christine Schwartz-Peterson, at some point during that month. According to plaintiff, her doctor prescribed an antibiotic and an anti-anxiety medication. Plaintiff, however, has provided no documentation of her visit to the doctor or the anti-anxiety prescription. Plaintiff did not see her doctor again until March 2006.

Plaintiff was absent five days during the first two weeks of her assignment to Room 206. She was also absent on March 10, 2006, and March 18, 2006, claiming on an "Employee Cause of Absence" form that she had a sinus infection. Plaintiff's doctor gave her a note on March 21, 2006, that stated that plaintiff was being treated for a sinus infection. According to plaintiff, Dr. Schwartz-Peterson also told her in March 2006 that she was depressed, and that if her symptoms worsened, she should go to United Mental Health. Plaintiff did not contact United Mental Health until April 2006.

Plaintiff's last day at Princeton was April 7, 2006. On April 17, 2006, plaintiff requested sick leave from the CPS Department of Human Resources. Acevedo received notice in April

2006 that plaintiff had applied for sick leave. Plaintiff signed a request for leave on June 22, 2006, in which she certified that her symptoms had begun two months earlier, or near the end of April.

According to plaintiff, she was hospitalized in a psychiatric ward for two weeks in May and June of 2006 for emotional distress, anxiety, and depression as a result of Acevedo's treatment. Once again, plaintiff has provided no documentation of her hospital visit or her claim that she is still under a doctor's care for emotional distress and depression.

Plaintiff's Non-Renewal

On February 8, 2006, Medina sent a letter to Acevedo stating that funding for plaintiff's position would not be available from OLCE during the 2006-07 year based on Princeton's declining ELL enrollment. On March 16, 2006, Acevedo received an email from the CPS Department of Human Resources, which stated that if Acevedo wished to non-renew any PATs, she needed to complete a form to do so by midnight on March 17, 2007. Acevedo chose to renew several PATs, including Alana Wilczak, who is Polish. Although Acevedo could have funded plaintiff's position with Princeton's discretionary funds,[5] Acevedo chose not to renew plaintiff because she was unhappy with her performance. Defendant ratified plaintiff's non-renewal on April 26, 2006. Plaintiff was one of 1062 PATs who were not renewed for the 2006-07 school year. On April 27, 2006, Arne Duncan, defendant's Chief Executive Officer, sent plaintiff a letter notifying her that she had not been renewed and that her termination was effective August 31, 2006.

---

[5]Princeton's budget for the 2005-06 school year included approximately $350,000 in discretionary funds. Plaintiff's salary was approximately $80,000 per year.

On March 23, 2006, Acevedo contacted the CPS Department of Labor Relations because plaintiff had been "insubordinate and disrespectful." A hearing was set for May 4, 2006, which plaintiff and her attorney attended. At the time of the hearing, plaintiff was on medical leave. The hearing officer recommended plaintiff's immediate termination on May 18, 2006, based on the fact that plaintiff was already on leave and had not been renewed for the following year, and that the school year was almost over. There was no mention in the hearing officer's summary of Acevedo's alleged remarks concerning Polish students or plaintiff's national origin. On June 1, the Director of Labor Relations sent plaintiff a letter stating that her termination was effective as of that date. The hearing officer's recommendation, however, was not sent to defendant to be ratified. Plaintiff, therefore, was not terminated until August 31, 2006, as a result of Acevedo's decision in April 2006 not to renew plaintiff for the 2006-07 school year.

## DISCUSSION

Defendant has filed a motion for summary judgment on all counts. Under Fed. R. Civ. P. 56(c), a court should grant a motion for summary judgment if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of material fact. See Celotrex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). When reviewing a summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to

7

determine whether there is a genuine issue of triable fact." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994).

Count I: Disability Discrimination

Count I of the complaint alleges that defendant discriminated against plaintiff by failing to provide her with a reasonable accommodation for her depression.[6] Under the ADA, "an employer must make 'reasonable accommodations' to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an 'undue hardship.' " 42 U.S.C. § 12112(b)(5)(A); EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 802 (7th Cir.2005). To establish a prima facie case for failure to accommodate, plaintiff must show that: (1) she is a qualified person with a disability; (2) defendant was aware of the disability; and (3) defendant failed to provide an accommodation for that disability. Id.

To establish that she has a disability, plaintiff must show that: (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) she has a record of such impairment; or (3) her employer regarded her as having a disability. 42 U.S.C. § 12102(2). Plaintiff asserts that her depression meets this first definition of disability because C.F.R. § 1630.2(h)(2) defines a physical or mental impairment to include "any mental or psychological disorder." What plaintiff fails to address, though, is the fact that a mental or psychological disorder qualifies as a disability only if it substantially limits one or more of plaintiff's major life activities. 42 U.S.C. § 12101(2)(a). Plaintiff makes no mention of any

---

[6]The complaint does not specify the type of ADA claim brought against defendant. Plaintiff's response to defendant's motion for summary judgment, however, indicates that she is pursuing a reasonable accommodation claim.

8

major life activity affected by her disability, and she continued to work until April 7, 2006, after Acevedo had decided not to renew plaintiff's position for the following school year.

Even assuming that plaintiff can establish that she is a qualified person with a disability, however, she simply cannot demonstrate that defendant was aware of her disability. Plaintiff did not tell anyone that she suffered from depression until June 2006, after the school year had ended, when she filled out a second request for medical leave. Until that point, defendant knew only that plaintiff suffered from a sinus infection, which is clearly not a disability under the ADA. Because plaintiff cannot establish a prima facie case of disability discrimination, the court grants defendant's motion for summary judgment as to Count I.

National Origin Discrimination

Count II of the complaint alleges that defendant discriminated against plaintiff because of her Polish national origin. The complaint references only plaintiff's termination, but plaintiff's response to defendant's motion for summary judgment addresses both her termination and an alleged hostile work environment. The court will therefore address both claims.

*Hostile Work Environment*

Plaintiff first alleges that Acevedo's comments regarding Polish students and plaintiff's national origin created a hostile work environment. To determine if plaintiff can prevail on her claim, the court looks to several factors, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Rizzo v. Sheahan, 266 F.3d 705, 712 (7th Cir. 2001). A hostile work environment claimant must show that she was singled out because of her membership in a protected class, and that the treatment

9

was so severe and pervasive as to alter the conditions of her employment in a significant way. Johnson v. Hondo, Inc., 125 F.3d 408, 415 (7th Cir. 1997).

Assuming that Acevedo made the alleged statements, plaintiff has demonstrated that she was singled out because of her status as an individual of Polish origin. Plaintiff must then establish that Acevedo's conduct was "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." Faragher v. Boca Raton, 524 U.S. 775, 786 (1998). In evaluating whether a workplace is hostile or abusive, the court must look at all the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Systems, Inc., 510 U.S. 17. 23 (1993). In the context of sexual harassment, the Seventh Circuit has noted that "[i]t is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other...." Robinson v. Sappington, 351 F.3d 317, 329-30 (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir.1995)). Moreover, according to the Supreme Court, "[s]imple teasing, offhand comments, and isolated instances (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788.

Plaintiff has alleged only isolated comments made by Acevedo regarding her Polish heritage. Further, plaintiff concedes that despite her numerous complaints to Medina and Womack about Acevedo, she never once mentioned Acevedo's comments regarding Polish students or plaintiff's status as a Polish immigrant. She also failed to mention Acevedo's comments when she filed her union grievance. Plaintiff did not, in fact, mention these comments

until she filed the instant lawsuit. For that reason, along with the limited frequency of the alleged comments, the court finds that the alleged comments by Acevedo were not severe or pervasive enough to alter plaintiff's work environment.

Finally, as raised in an affirmative defense, defendant had in place a General Non-Discrimination Policy and reporting procedures for employees experiencing discrimination to follow. At no point did plaintiff avail herself of these reporting procedures or in any other way notify defendant of the comments made by Acevedo. An employer cannot be held liable for a supervisor's discriminatory actions when the employee experiencing those actions fails to utilize the reporting methods available to her. Faragher, 524 U.S. at 807. For these reasons, the court grants defendant's motion for summary judgment as to plaintiff's hostile work environment claim.

*Termination: Direct Evidence*

Plaintiff alleges that defendant terminated plaintiff based on her Polish national origin in violation of Title VII. To prove such a claim, plaintiff may use either direct or indirect evidence. Rozskowiak v. Village of Arlington Heights, 415 F.3d 608, 612 (7th Cir. 2005). Because plaintiff argues that she has both direct and indirect evidence of national origin discrimination, the court will address both methods of proof.

Direct evidence of discrimination is evidence that, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." Cowan v. Glenbrook Sec. Svcs., Inc., 123 F.3d 438, 443 (7th Cir. 1997). Such evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." Id. Direct evidence can also be proven with circumstantial evidence that

11

allows a factfinder to infer intentional discrimination on the part of the decisionmaker. Rhodes v. Illinois Dept. of Transportation, 359 F.3d 498, 504 (7th Cir. 2004). That evidence may consist of one of the following three types: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other pieces of evidence from which an inference of discriminatory intent might be drawn; (2) evidence that similarly situated employees not in plaintiff's protected class received systematically better treatment; and (3) evidence that plaintiff was qualified for the job in question and was replaced by a person in plaintiff's protected class, and that the employer's stated reason for the difference in treatment is not believable. Troupe v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).

As discussed above, plaintiff has alleged that Acevedo made several comments to plaintiff regarding her Polish national origin. Plaintiff, however, provides no support for her allegations besides her own self-serving deposition transcript. She concedes that although she sent numerous e-mails and letters to Acevedo's supervisors regarding their interactions, she never once mentioned Acevedo's derogatory comments or availed herself of defendant's discrimination reporting procedures. Additionally, plaintiff does not provide any evidence that Acevedo's comments were causally related to her decision not to renew plaintiff for the 2006-07 school year.

Plaintiff fares no better with circumstantial evidence. As mentioned above, Acevedo knew that plaintiff was Polish when she hired her. In fact, Acevedo has stated that she hired plaintiff in part because she was Polish, and her language skills were in demand at Princeton. Acevedo also hired Alana Wilczak, another Polish PAT, and chose to renew her for the

following school year. Further, according to plaintiff, Acevedo made her derogatory comments in November 2005, several months before her decision in April 2006 not to renew plaintiff. Finally, defendant has proffered multiple reasons for the decision to terminate plaintiff: numerous problems with students and parents; difficulty interacting with members of the Princeton school community; failure to follow teaching schedules; and limited discretionary funding with which to pay plaintiff's salary. Plaintiff has provided no support for her assertions that these reasons are pretextual. Because plaintiff has not provided sufficient direct or circumstantial evidence of national origin discrimination, the court finds that she cannot succeed on her claim under the direct method of proof.

*Termination: Indirect Evidence*

Because plaintiff cannot prevail on Count II using the direct method of proof, her remaining option is the burden-shifting method set out in McDonnell Douglas v. Green, 411 U.S. 792 (1973). Under that method, plaintiff must first demonstrate that: (1) she is a member of a protected class; (2) she was performing according to her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated individuals not in plaintiff's protected class were treated more favorably. Biolchini v. General Elec. Co., 167 F.3d 1151, 1153-54 (7th Cir. 1999). If plaintiff establishes a prima facie case, the burden then shifts to defendant to articulate a legitimate, non-discriminatory reason for plaintiff's termination. The presumption of discrimination dissolves, and the burden shifts back to the employee to prove that the employer's proffered reasons are a pretext for discrimination. Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994). At all times, the plaintiff bears the

ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her. Hughes v. Brown, 20 F.3d 745, 747 (7th Cir. 1994).

Plaintiff is able to satisfy the first and third prongs of her prima facie case. As for the second prong, she claims that she was performing her job adequately. Plaintiff, however, cannot substitute her own opinion of her job performance for that of defendant. See., e.g., Oranika v. City of Chicago, 2007 WL 54068, *11 (N.D. Ill. Jan. 3, 2007). Defendant has presented evidence that plaintiff had numerous problems following directions, interacting with students and parents, and treating Acevedo, her supervisor, with respect. Regarding the fourth prong of her prima facie case, plaintiff claims that other non-Polish PATs were renewed for the following school year. Plaintiff neglects to mention, though, that another Polish PAT at Princeton was renewed. The court therefore finds that plaintiff cannot establish her prima facie case.

Even assuming, however, that plaintiff could do so, defendant has presented a legitimate, non-discriminatory reason for plaintiff's termination. Plaintiff's position for the 2005-06 school year was funded through OLCE, and that funding was eliminated for the 2006-07 school year. To keep plaintiff at Princeton, Acevedo would have needed to use her discretionary funds. Because she was not satisfied with plaintiff's performance as a non-tenured teacher, Acevedo opted not to renew plaintiff for the 2006-07 school year. Plaintiff has not presented any evidence that defendant's reason for not renewing her was a pretext for discrimination based on her Polish national origin. The court therefore finds that plaintiff cannot succeed on Count II under the McDonnell Douglas method of proof. For that reason, and for the other reasons discussed above, the court grants defendant's motion as to Count II.

Count III: Retaliatory Discharge

Plaintiff alleges in Count III of the complaint that defendant terminated her in retaliation for complaining that her assignment to Room 206 violated the No Child Left Behind Act. Specifically, plaintiff asserts that after the Chicago Teachers Union filed a grievance on her behalf on April 18, 2006, she received a letter informing her that defendant had terminated her effective June 1, 2006, based on the results of an investigatory conference.

Defendant initially argues that it is immune from liability pursuant to 745 ILCS 10/2-109, which states that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." Plaintiff, however, counters that according to the Illinois Supreme Court's recent decision in Smith v. Waukegan Park District, – N.E. 2d –, 2008 WL 1746664 (Ill. 2008), defendant is no longer immune from liability for the tort of retaliatory discharge. That opinion, though, states only that public entities have "no immunity for retaliatory discharge based on the exercise of workers' compensation rights." Id. at *6. It does not reach the issue of retaliatory discharge for the exercise of other rights. The Illinois Supreme Court's holding in Smith, therefore, does not apply to the facts of the instant case.

Further, plaintiff can prevail on a claim of retaliatory discharge only if defendant's action "violates a clearly mandated public policy." See, e.g., Barr v. Kelso-Burnett Co., 106 Ill. 2d 520, 525 (Ill. 1985). Plaintiff fails to specify the public policy violated by her termination, arguing only that defendant violated the No Child Left Behind Act, and in doing so failed to provide quality education to its students. As discussed above, however, plaintiff has not demonstrated that defendant violated the law in question. The OLCE bilingual compliance auditor found that Room 206 was not a Spanish bilingual classroom, and that plaintiff possessed the required

15

qualifications to teach the students in that room. Because plaintiff has not identified a "clearly mandated public policy" violated by her termination, the court grants defendant's motion for summary judgment as to Count III.

Count IV: First Amendment Retaliation

Count IV of the complaint alleges that defendant retaliated against plaintiff for exercising her First Amendment rights in violation of 42 U.S.C. § 1983. Specifically, plaintiff claims that defendant terminated her for voicing her opinion that her assignment to Room 206 violated the No Child Left Behind Act. To prevail on this claim, plaintiff must demonstrate that defendant's unconstitutional action was taken pursuant to a municipal custom or policy.[7] Monell v. Dept. of Social Servs., 436 U.S. 658, 694 (1978). Such a custom or policy can be established in three ways: "(1) an express policy that, when enforced, cause[d] a constitutional deprivation; (2) a wide-spread practice that, although not authorized by written law or express municipal policy, [was] so permanent or well-settled as to constitute a custom or usage with the force of law; or (3) the act of a person with final policy-making authority." McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir. 1995).

Plaintiff focuses the bulk of her argument on the fact that her complaints regarding her assignment to Room 206 constituted speech on a matter of public concern. What plaintiff fails to realize, though, is that she must, as a threshold issue, identify a municipal custom or policy as discussed above. Plaintiff has not identified an express policy authorizing retaliation for the

---

[7]Only the Board was named as a defendant in the instant suit, and there is no respondeat superior liability in § 1983 cases. Monell, 436 U.S. at 691.

exercise of First Amendment rights. She has similarly failed to identify any widespread practice by defendant of retaliation for constitutionally protected speech.

Plaintiff does claim that Acevedo was a person with final policymaking authority, although she fails to provide a citation for that assertion. Further, as defendant addresses, Acevedo has no policymaking authority as a matter of law. "[W]hether a particular official has 'final policymaking authority' is a question of state law." City of St. Louis v Praprotnik, 485 U.S. 112, 123 (1988). In the state of Illinois, "the School District's Board of Education has full power to manage the schools and to adopt all rules and regulations for that broad purpose." 105 ILCS 5/10-20.5. The School Code also states that "The right to employ, discharge, and layoff shall be vested solely with the board." 105 ILCS 5/34-8.1. Because Acevedo had no policymaking authority, plaintiff cannot prevail on her Monell claim. The court therefore grants defendant's motion for summary judgment as to Count IV.

## CONCLUSION

For the reasons discussed above, the court grants defendant's motion for summary judgment on all counts.

**ENTER:** **June 25, 2008**

_____
**Robert W. Gettleman**
**United States District Judge**